**FIFTH DIVISION**
**PHIPPS, P. J.,**
**DILLARD and PETERSON, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**May 18, 2016**

# In the Court of Appeals of Georgia

A16A0128. KOGEL v. KOGEL.

DILLARD, Judge.

Briona Danielle Kogel appeals from the trial court's denial of her motion to vacate a temporary order that granted custody of her minor child to the child's father, Christofor Kogel, after Christofor filed for divorce from Briona. Briona argues on appeal that the trial court lacked subject-matter jurisdiction to enter an order of child custody under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"). Because we agree that the trial court lacked subject-matter jurisdiction to make a child-custody determination, we reverse the trial court's denial of Briona's motion to vacate.

The record reflects that Briona and Christofor were married in Texas on December 24, 2011. Briona then gave birth to their child, X. K., in Texas on June 25,

2012. In March 2013, approximately nine months after X. K. was born, Briona, Christofor, Christofor's mother, and X. K. moved to Wyoming. Then, in January 2014, the family again relocated—this time to Georgia. But in April 2014, Briona returned to Texas with X. K. under the auspices of visiting a sick relative. Then, when Briona did not return to Georgia, Christofor filed for divorce in the Superior Court of Murray County in July 2014, seeking temporary and permanent physical custody of X. K.

On August 21, 2014, the trial court conducted a hearing in Christofor's action. At that point, Briona had not filed an answer, and she did not appear at the hearing. And at the hearing's conclusion, the trial court awarded temporary custody of X. K. to Christofor, finding that Briona was making a "temporary sojourn" to Texas because she had indicated to Christofor that she would return to Georgia.

Briona filed an answer and counterclaim on November 11, 2014, and then filed a motion to vacate the trial court's temporary order on April 13, 2015. Briona argued that the court should vacate its earlier temporary order because it lacked subject-matter jurisdiction to make an initial child-custody determination under the UCCJEA when Georgia was not X. K.'s home state. The trial court conducted a hearing on

2

Briona's motion on June 5, 2015, at which it heard testimony from Briona, Christofor, and Christofor's mother.

Christofor testified that when Briona and X. K. left for Texas in April 2014, Briona told him that she would return in "a few days." But then four to five days later, Briona called Christofor to say that she had no intention of ever returning to Georgia and that, "You'll be lucky if you ever see me and [X. K.] again. I'm not coming back." And indeed, Briona and X. K. never returned to Georgia, although Christofor testified that Briona thereafter "lead [sic] on that she was" going to return to Georgia, told him that she loved him, and said that she was waiting for her car to be repaired in order to return.[1] However, Christofor also testified that Briona at other times told him she would *not* be returning to Georgia, that she would become upset with him over the phone, and that she would ask that he stop contacting her. And as to the excuse of awaiting repairs to her vehicle, Christofor further testified that Briona continued over a number of months to cite additional repairs that had yet to be completed.

---

[1] Christofor's mother also testified that she received text messages from Briona indicating that she would eventually return to Georgia.

3

As for Briona, she testified that when she left Georgia in April 2014, she did so to escape a physically abusive relationship with Christofor.[2] Thus, when Briona left in April 2014, she did so with no intention to return, but she testified that she initially told Christofor otherwise out of fear for her safety and that of her child. And although Briona eventually told Christofor that she was never returning to Georgia, she later led him to believe that she would eventually return to the state out of continued fear for her life because Christofor knew where to find her in Texas. In short, the only reason Briona told Christofor that she would return to Georgia and that she loved him was because she was fearful of him. Briona further testified that X. K. had a doctor in Texas, attended church in Texas, had relatives that he regularly visited in Texas, received public benefits in Texas, and that she maintained employment in Texas.

At one point during Briona's testimony, the trial court opined that Briona had "established that she was leading [Christofor] on to make him think she was returning to Murray County when she wasn't." But in both the trial court's oral and written ruling denying Briona's motion, the court

---

[2] Christofor denied ever physically abusing Briona.

4

[found] that according to the testimony [Briona] led [Christofor] to believe that she was returning to Georgia; that her trip to Texas was temporary as found in the Temporary Order. Now, she would maintain that she was lying, and she would tell the [c]ourt that those statements should not be considered. The [c]ourt finds that all of [Briona's] actions, misrepresentations of her intent and contempt of court appear to be self serving and contrary to the best interest of the child and justice.

The trial court also took issue with the timeliness of Briona's challenge to its subject-matter jurisdiction, noting that "[o]ther than the Defendant's attorney's statements that her failure to act to promptly prosecute the issue of the [c]ourt's jurisdiction was because of financial need, the [c]ourt has not received any credible evidence of such facts." The court then denied Briona's motion to vacate the temporary order of child custody and held her in contempt of that order. This appeal follows.[3]

---

[3] Briona filed an application for an interlocutory appeal, which this Court granted because she was entitled to a direct appeal. *See* OCGA § 5-6-34 (a) (11) ("Appeals may be taken to the Supreme Court and the Court of Appeals from the following judgments and rulings of the superior courts, the constitutional city courts, and such other courts or tribunals from which appeals are authorized by the Constitution and laws of this state: . . . . All judgments or orders in child custody cases awarding, refusing to change, or modifying child custody or holding or declining to hold persons in contempt of such child custody judgment or orders . . . .").

At the outset, we note that—as we have previously stated and as required by the Act itself—in applying and construing the provisions of the UCCJEA as codified in Georgia,[4] we must consider "the need to promote uniformity of the law with respect to its subject matter among states that enact it."[5] In accordance with this mandate, and given the relative dearth of Georgia law on this subject, we will look to the cases of other jurisdictions when appropriate to resolve the issues presented in this case.[6] With these guiding principles in mind, we turn now to Briona's contention that the trial court erred by denying her motion to vacate its earlier child-custody

---

[4] Georgia adopted the UCCJEA in 2001 and replaced its prior child-custody act (the Uniform Child Custody Jurisdiction Act), because, in application, "imprecision in the prior act's language often allowed for the existence of concurrent jurisdiction over custody matters in multiple states, thereby fostering competition among jurisdictions and forum shopping by the parties." *Bellew v. Larese*, 288 Ga. 495, 497 (706 SE2d 78) (2011) (punctuation omitted); *accord Croft v. Croft*, 298 Ga. App. 303, 305 (1) (680 SE2d 150) (2009).

[5] OCGA § 19-9-101; *accord Delgado v. Combs*, 314 Ga. App. 419, 425 (724 SE2d 436) (2012).

[6] *See Delgado*, 314 Ga. App. at 425 (looking to cases in other jurisdictions to resolve jurisdictional question under provisions of UCCJEA).

order when it lacked subject-matter jurisdiction to make an initial child-custody determination—a question we review *de novo*.[7]

First, as to the issue of the timeliness of Briona's challenge to the trial court's subject-matter jurisdiction, it is well established that a "court's lack of subject-matter jurisdiction cannot be waived and may be raised *at any time* either in the trial court, in a collateral attack on a judgment, or in an appeal."[8] Indeed, the Supreme Court of the United States has recognized that, although "our legal system is replete with rules requiring that certain matters be raised at particular times,"[9] objections to subject-matter jurisdiction "may be raised at any time,"[10] even if the party "previously acknowledged the trial court's jurisdiction."[11] Therefore, a party, after losing at trial,

---

[7] *See id.* at 425 (1) (noting that whether a trial court lacked subject-matter jurisdiction is "an issue of law that we review de novo for plain legal error" (punctuation omitted)); *MacBeth v. State*, 304 Ga. App. 466, 466 (696 SE2d 435) (2010) (same).

[8] *Abushmais v. Erby*, 282 Ga. 619, 622 (3) (652 SE2d 549) (2007) (emphasis supplied) (punctuation omitted); *see Jackson v. Gamble*, 232 Ga. 149, 152 (205 SE2d 256) (1974) ("Waiver or consent of the parties cannot confer on a court jurisdiction of a subject matter wherein it has none at law." (punctuation omitted)).

[9] *Henderson v. Shinseki*, 562 U.S. 428, 434 (II) (131 SCt 1197, 179 LE2d 159) (2011).

[10] *Id.*

[11] *Id* at 435 (II).

7

may "move to dismiss the case because the trial court lacked subject-matter jurisdiction,"[12] and "if the trial court lacked jurisdiction, many months of work on the part of the attorneys and the court may be wasted."[13] Thus, to the extent the trial court took issue with the "timeliness" of Briona's challenge to its subject-matter jurisdiction and in any way held that against her in ruling upon her motion to vacate, it erred in doing so.

Second, as to the question of whether the trial court *had* subject-matter jurisdiction to make an initial child-custody determination in the temporary order, Georgia's codification of the UCCJEA provides that a court has jurisdiction to make such a determination if Georgia "is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state[.]"[14] Elsewhere in the Code, "home state" is defined as "the state in which a child lived with a parent or a person acting as a parent for *at least six consecutive months*

___

[12] *Id.* at 434-35 (II).

[13] *Id.* at 435 (II).

[14] OCGA § 19-9-61 (a) (1).

8

immediately before the commencement of a child custody proceeding."[15] And the definition further provides that "[a] period of temporary absence of any of the mentioned persons is part of the [six-month] period."[16] However, the UCCJEA does not define what constitutes a "temporary absence." Thus, the issue in this case is whether Georgia is X. K.'s "home state" for purposes of exercising UCCJEA jurisdiction when X. K. moved to the state with his family in January 2014, returned to Texas with his mother in April 2014, and never returned to Georgia, although Briona at times represented to Christofor that she would eventually return to Georgia with the child.

It is clear from the trial court's ruling and statements on the record that it concluded Briona had no intention of returning to Georgia. Nevertheless, the court held Briona's "misrepresentations of her intent" against her because it deemed them "self serving," and the court ultimately denied her motion to vacate the temporary

---

[15] OCGA § 19-9-41 (7) (emphasis supplied). We note that in cases with a child who is less than six months old, "the term means the state in which the child lived from birth with any of the persons mentioned." *Id.*

[16] OCGA § 19-9-41 (7).

order.[17] But the court erred in denying the motion to vacate because it lacked subject-matter jurisdiction to make the initial child-custody determination in the temporary order. Indeed, the record does not establish that Briona's time in Texas was a "temporary sojourn" as the court initially found and, therefore, Georgia could not qualify as X. K.'s home state under the UCCJEA.

As set forth more fully *supra*, although Christofor testified that he was "led to believe" that Briona would eventually return to Georgia, he also testified that Briona told him only a few days after she left that he would "be lucky" if he ever saw her and X. K. again and that she was, in no uncertain terms, "not coming back"; that she told him more than once that she did not intend to return (even as late as June 2014); and that she *repeatedly* made new excuses about the repair condition of her vehicle, supposedly delaying her ability to return. Additionally, Briona maintained employment in Texas, and X. K. had been born in and previously lived in Texas, had extended family with whom he frequently visited in Texas, attended church in Texas, had a regular doctor in Texas, and received public benefits in Texas. This was in contrast to Georgia, where X. K. never attended church; the extent of his medical

---

[17] We note that Christofor did not argue, and the trial court did not explicitly find, that Briona had wrongfully removed X. K. from Georgia or otherwise engaged in unjustifiable conduct.

10

treatment was limited to an emergency room visit for severe diaper rash; and his only other familial connection was a distant cousin who lived in Atlanta and with whom the family had not visited since relocating to Georgia for no other reason than to make a "fresh start." Finally, Briona testified that she had *never* intended to return to Georgia, that she left in order to flee an abusive relationship with Christofor, and that she at times told Christofor that her intentions were otherwise out of fear for her and X. K.'s safety.

Thus, looking at the totality of the circumstances,[18] the record reflects that X.

K.'s time in Texas was not a temporary absence from Georgia.[19] It follows, then, that

[18] *See, e.g.*, *In re A. W.*, 94 A3d 1161, 1167-68 (¶ 21) (Vt. 2014) ("[C]ourts addressing the question of 'temporary absence' have noted that the term is not defined under the UCCJA or its successor the UCCJEA, and many, therefore, have adopted a 'totality of the circumstances' test, looking to whether all of the facts as found by the trial court, including the parent's purpose in removing the child from one state to another and the duration of the absence, support a conclusion that a child's absence was temporary."); *In re S.M.*, 938 SW2d 910, 918 (Mo. Ct. App.1997) (holding that, in "resolving the temporary absence issue, the totality of the circumstances test is best"); *Chick v. Chick*, 596 SE2d 303, 308-09 (I) (N.C. Ct. App. 2004) (adopting totality-of-the-circumstances test to determine whether absence from state was temporary under UCCJEA). *See generally* Andrea Charlow, *There's No Place Like Home: Temporary Absences in the UCCJEA Home State*, 28 J. AM. ACAD. MATRIM. LAW. 25, 34-35 (II) (B) (3) (2015) (noting that "the 'totality of the circumstances' test is commonly used to determine if an absence is temporary," and that courts will consider the following: intent, duration, nature and purpose of presence outside of state, applications for driver's licenses and public benefits, paying taxes, home ownership or leasing, school registration, presence as related to the receipt of medical care, and presence for parental educational or job opportunities).

[19] *Cf. Slay v. Calhoun*, 332 Ga. App. 335, 341 (2) (772 SE2d 425) (2015) (physical precedent only) ("There was evidence at the final hearing that [the mother] frequently was unable to care for [the child] and called [the father] or his mother to come pick up the child. Thus, the trial court was authorized to find that in the six months before [the father] filed the Petition, [the child] spent more time with [the father] in Georgia than with [the mother] in Florida. The evidence showed that [the child] received almost all of her medical care in Georgia. Under the circumstances, the trial court could have concluded that even though [the mother] moved to or resided in Florida, [the child] continued to live with [the father], a person acting as [the child]'s parent; [the child]'s absences to stay with her mother, who was unable to care for [the child] consistently, were temporary; and, accordingly, Georgia was [the child]'s home state for purposes of the UCCJEA.").

Georgia was not X. K.'s home state because X. K. had not lived in Georgia for at least six months immediately before commencement of the child-custody proceeding.[20] Additionally, at the time of the custody determination, even if X. K. had no "home state," Georgia still lacked jurisdiction to make an initial child-custody determination when neither of X. K.'s parents had "a significant connection with this state other than mere physical presence" *and* Georgia did not contain "[s]ubstantial evidence . . . concerning [X. K.'s] care, protection, training, and personal relationships."[21]

Accordingly, the trial court erred in denying Briona's motion to vacate the temporary custody order when the court never had subject-matter jurisdiction to make an initial child-custody determination. And for all of the foregoing reasons, we

---

[20] *See* OCGA § 19-9-41 (7) (defining "home state" as "the state in which a child lived with a parent or a person acting as a parent for *at least six consecutive months* immediately before the commencement of a child custody proceeding" (emphasis supplied)).

[21] *See* OCGA § 19-6-61 (a) (2) ("Except as otherwise provided in Code Section 19-9-64, a court of this state has jurisdiction to make an initial child custody determination only if: . . . A court of another state does not have jurisdiction under paragraph (1) of this subsection, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under Code Section 19-9-67 or 19-9-68 and: (A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and (B) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships[.]").

reverse the trial court's denial of Briona's motion to vacate the temporary order of custody.

*Judgment reversed. Phipps, P. J., and Peterson, J., concur*.